SUPERIOR COURT 
 
 INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS v. NATIONAL FIRE

 
 Docket:
 2384CV02517-BLS2
 
 
 Dates:
 March 15, 2024
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ON DEFENDANT’S MOTION TO DISMISS
 
 

 The International Association of Fire Fighters (“IAFF”) is a labor organization that represents firefighters. The National Fire Protection Association, Inc., is a non-profit organization that (among other things) promulgates codes and standards related to fire safety.
The IAFF contends that NFPA promulgated and maintains a standard for firefighters’ turnout gear (also known as bunker gear) that effectively requires manufacturers to use PTFE (polytetrafluoroethylene) and other PFAS (polyfluorinated alkyl substances) that are carcinogenic, especially when subjected to heat. It alleges that NFPA has done so to further the commercial interests of some of its members that produce materials for use in turnout gear that contain PTFE or other PFAS. The IAFF claims that NFPA is liable for engaging in a civil conspiracy with manufacturers of turnout gear, for engaging in unfair or deceptive conduct in trade or commerce in violation of G.L. c. 93A, § 11, and for negligence.
NFPA has moved to dismiss all of these claims. The Court will allow the motion in part with respect to the conspiracy claim, because the IAFF alleges no facts suggesting that the disputed standard is unlawful or that NFPA or any co-conspirators used any unlawful purpose to achieve or maintain the standard. It will deny the motion in part as to the claim under c. 93A and the negligence claim, because the facts alleged by the IAFF plausibly suggest that NFPA may be liable under either or both of these theories, and the IAFF is not required to join equipment manufacturers as defendants before seeking relief against NFPA.
1. Civil Conspiracy Claim. “Massachusetts law recognizes two distinct theories of liability under the umbrella term of ‘civil conspiracy’;” one is known as a “ ’concerted action’ conspiracy,” while the other is known as a “true
 
                                                            -1-
 
conspiracy.” Greene v. Philip Morris USA Inc., 491 Mass. 866, 871 (2023) (citations omitted).
The IAFF specifies in its complaint that it asserting a conspiracy claim only under the “true conspiracy” theory.
To state such a claim, the IAFF must allege facts plausibly suggesting “that alleged conspirators agreed to accomplish an unlawful purpose or ‘a lawful purpose by unlawful means,’ … and then caused harm to the plaintiff via ‘some “peculiar power of coercion” ’ that they would not have had, had they been acting independently.” Greene, 491 Mass. at 871 n.1, quoting Willett v. Herrick, 242 Mass. 471, 479–480 (1922), then quoting DesLauries v. Shea, 300 Mass. 30, 33 (1938); accord, e.g., Wodinsky v. Kettenbach, 86 Mass. App. Ct. 825, 837 (2015) (affirming jury verdict of liability under this theory).
If neither the purpose nor the means used is illegal, then the alleged combination cannot give rise to liability on a true conspiracy theory. See Neustadt v. Employers Liability Assur. Corp. Ltd., 303 Mass. 321, 325 (1939) (affirming demurrers—what we would now call motions to dismiss[1]—and final decree dismissing action); DesLauries, 300 Mass. at 33–34 (affirming directed verdict for defendants); Robitaille v. Morse, 283 Mass. 27, 30–35 (1933) (affirming demurrers and ordering judgment for defendants).
The IAFF does not point to, and the Court cannot find, any factual allegations in the complaint that plausibly suggest NFPA or any co-conspirators set about to accomplish an unlawful purpose, or used unlawful means to achieve an otherwise  permissible  goal.[2]    Since  the  facts  alleged  could  not  establish  a
 
--------------------------------------------
 
[1] Before the Massachusetts Rules of Civil Procedure took effect on July 1, 1974, civil actions could be challenged through a “Demurrer.” The modern equivalent is the filing a motion to dismiss for failure to state a claim upon which relief can be granted, under Mass. R. Civ. P. 12(b)(6). Hub Theatres, Inc. v. Massachusetts Port Auth., 370 Mass. 153, 154 note a (1976); see also Curran v. Boston Police Patrolmen’s Ass’n, Inc., 4 Mass. App. Ct. 40, 40 (1976) (demurrer filed before July 1, 1974, was properly treated by Superior Court judge “as a motion to dismiss under Mass. R. Civ. P. 12(b)(6)”).
[2] To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that, if true, would “plausibly suggest[] … an entitlement to relief.” Lopez v. Commonwealth, 463 Mass. 696, 701 (2012), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).
 
                                                            -2-
 
necessary element of the IAFF’s “true conspiracy” claim, NFPA is entitled to dismissal of that claim under Rule 12(b)(6).
Though the IAFF alleges that NFPA and co-conspirators “entered into a combination to accomplish an unlawful purpose and/or to accomplish a lawful purpose through unlawful purposes,” it does not support those legal conclusions with any factual allegations of unlawful purposes or means. Merely stating this element of a true conspiracy claim, without alleging any supporting facts, is not sufficient to state a viable claim. See Polay v. McMahon, 468 Mass. 379, 388 (2014) (affirming dismissal of claim based on conclusory recitation of element of claim, unsupported by any factual allegation). “Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.” Doe v. American Guar. & Liab. Co., 91 Mass. App. Ct. 99, 105 (2017), quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).
In deciding NFPA’s motion to dismiss, the Court must “look beyond the conclusory allegations in the complaint and focus on whether the factual allegations plausibly suggest an entitlement to relief.” Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, 473  Mass. 336, 339 (2015), quoting Curtis v. Herb Chambers I–95, Inc., 458 Mass. 674, 676 (2011). “While ‘detailed factual allegations’ are not required at the pleading stage, mere ‘labels and conclusions’ will not survive a motion to dismiss.” Burbank Apartments Tenant Ass’n v. Kargman, 474 Mass. 107, 116 (2016), quoting Iannacchino, 451 Mass. at 636.
2. Claim under G.L. c. 93A, § 11. The IAFF has asserted a viable claim that NFPA engaged in unfair or deceptive conduct that interfered with trade or commerce in violation of G.L. c. 93A.
2.1. Unfair or Deceptive Conduct. The argument that “the Complaint has no allegations of unfair or deceptive conduct by NFPA” is unavailing.
The IAFF alleges that the NFPA adopted and maintains a standard for manufacturing fire fighter bunker gear that provides no safety benefit and instead creates serious health risks by exposing fire fighters to cancer-causing chemicals that can volatilize when exposed to the heat of a fire. It asserts that, although NFPA holds itself out as adopting standards that will help prevent personal injury and property damage caused by fire, NFPA deceptively adopted a UV light degradation test methodology that does not serve those purposes but instead “was deliberately chosen” to require that PFAS be used
 
                                                            -3-
 
in the middle moisture barrier layer of fire fighters’ bunker gear. And the IAFF further alleges that NFPA did so to further the commercial interests of NFPA members that manufacture materials that contain these chemicals.
In deciding NFPA’s motion to dismiss under Mass. R. Civ. P. 12(b)(6), the Court must assume that these factual allegations, and any reasonable inferences that may be drawn from the facts alleged, are true. See Golchin v. Liberty Mut. Ins. Co., 460 Mass. 222, 223 (2011).
These allegations adequately support the IAFF’s c. 93A claim because they plausibly suggest that NFPA engaged in unfair and deceptive conduct in trade or commerce. Though the IAFF does not allege that the challenged NFPA standard is somehow illegal, that is not required. “Legality of underlying conduct is not necessarily a defense to a claim under c. 93A.” Kattar v. Demoulas, 433 Mass. 1, 13 (2000). “Chapter 93A creates new substantive rights and, in particular cases, ‘mak[es] conduct unlawful [that] was not unlawful under the common law or any prior statute.’ ” Commonwealth v. Fremont Investment & Loan, 452 Mass. 733, 742 (2008), quoting Kattar, supra, at 12.
2.2. No Direct Commercial Relationship. NFPA’s assertion that it cannot be held liable under c. 93A because it had no direct commercial relationship and never entered into any transaction with the IAFF is also without merit. The IAFF can prove that NFPA’s alleged malfeasance took place in a business context, and thus implicates c. 93A, by showing either “that the defendant had a commercial relationship with the plaintiffs or that the defendant’s actions interfered with ‘trade or commerce’ ” in some other way. See First Enterprise, Ltd. v. Cooper, 425 Mass. 344, 347 (1997) (emphasis added).
To prevail on a claim under G.L. c. 93A, a plaintiff must be able to show that the defendant engaged in “unfair or deceptive acts or practices ‘in the conduct of any trade or commerce.’ ” Office One, Inc. v. Lopez, 437 Mass. 113, 125 (2002), quoting G.L. c. 93A, § 2. That is true whether a claim is asserted by an individual consumer under § 9 or by a business under § 11. See Frullo v. Landenberger, 61 Mass. App. Ct. 814, 821 (2004). The ”trade or commerce” requirement is satisfied “when the defendant was operating in ‘a business context’ at the time of its allegedly unfair or deceptive activity.” UBS Financial Services, Inc. v. Aliberti, 483 Mass. 396, 411 (2019), quoting Feeney v. Dell Inc., 454 Mass. 192, 212 (2009).
 
                                                            -4-
 
“Parties need not be in privity for their actions to come within the reach of c. 93A.” UBS Financial Services, Inc. v. Aliberti, 483 Mass. 396, 410 (2019), quoting Kattar, 433 Mass. at 14–15. That is “because c. 93A allows any person who has been injured by trade or commerce indirectly affecting the people of this Commonwealth to bring a cause of action” (emphasis in original). Id., quoting Ciardi v. F. Hoffmann-La Roche, Ltd., 436 Mass. 53, 60 (2002).
For example, bringing a baseless lawsuit in an attempt to interfere with business relations between other parties constitutes interference with trade or commerce that violates c. 93A. See Rental Property Mgmt.  Svcs.  v.  Hatcher,  479 Mass. 542, 552 n.9 (2018) (dictum), quoting G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273, 277 (1991) (litigation conduct that supports claim for tortious interference with contractual relations also supports c. 93A claim). Similarly, knowingly or recklessly conveying false information in order to help a client bring about a commercial transaction with a third party is a violation of c. 93A. See, e.g., Kirkland Const. Co. v. James, 39 Mass. App. Ct. 559, 563-564 (1995) (reversing dismissal of 93A claim against lawyers who conveyed alleged misrepresentation by client and thereby allegedly induced plaintiff to contract with lawyers’ client).
“[E]ach case requires examination of its own circumstances to determine whether it arose in a ‘business context.’ ” Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 24 (1997) (holding defendant’s status as charitable corporation not dispositive of whether c. 93A applies), quoting Planned Parenthood Fed’n of America, Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 493 (1986) (same).
The factual allegations that the IAFF asserts in its complaint adequately allege that NFPA was operating in a business context and interfered with trade or commerce by creating circumstances that effectively require fire firefighters to purchase bunker gear laced with potentially carcinogenic chemicals, in order to benefit manufacturers that use those chemicals.
3. Negligence Claim. The IAFF has also asserted a viable claim that for negligence.
3.1. Duty of Care. NFPA asserts that it owed no duty of care to the IAFF as a matter of law. Whether a defendant owed a duty of care is a question of law that is appropriately addressed on a Rule 12(b)(6) motion to dismiss. Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 40 (2009). But the Court is not persuaded by
 
                                                            -5-
 
NFPA’s assertion that it had no duty to refrain from adopting manufacturing standards that, if followed, could harm or kill people.
 “Negligence is the failure to exercise that degree of care which a reasonable person would exercise in the circumstances.” Guzman v. Pring-Wilson, 81 Mass. App. Ct. 430, 432 (2012), quoting Morgan v. Lalumiere, 22 Mass. App. Ct. 262, 267 (1986).
Every person and every organization has a duty to exercise reasonable care to avoid foreseeable physical harm to others, with some exceptions that do not apply here. Remy v. MacDonald, 440 Mass. 675, 677 (2004). In other words, in general every actor “owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.” Jupin v. Kask, 447 Mass. 141, 147 (2006), quoting Tarasoff v. Regents of the Univ. of Cal., 17 Cal. 3d 425, 434, 551 P.2d 334 (1976).
These principles apply with full force to trade associations and other organizations that set safety standards that they know will be followed by others; they have a duty of care to ensure that their standards, if followed, would prevent foreseeable harm to end-users of products manufactured in accord with those standards. See Snyder v.  American Ass’n  of  Blood  Banks, 676 A.2d 1036, 1048–1051 (N.J. 1996) (trade association that set standards for blood banks owed duty of care, and could be liable in negligence, to transfusion recipient who contracted AIDS after receiving transfusion of blood contaminated with HIV); Jappell v. American Ass’n of Blood Banks, 162 F.Supp.2d 476, 480–482 (E.D. Va. 2001) (same); King v. National Spa and Pool Institute, Inc., 570 So.2d 612, 616 (Ala. 1990) (trade association owed duty of care in promulgating safety standards for safe diving from boards installed in residential swimming pools); Meneely v. S.R. Smith, Inc., 5 P.3d 49, 57–58 (Wash. Ct. App. 2000) (same).
“Fundamentally, the existence of a duty of care depends upon the foreseeability of a risk of harm that the defendant has an ability to prevent.” Heath-Latson v. Styller, 487 Mass. 581, 584 (2021). The facts alleged in the complaint plausibly suggest it was foreseeable that manufacturers would follow NFPA’s standards when designing and manufacturing fire fighters’ turnout gear, and that doing so would result in fire fighters unnecessarily being exposed to carcinogens. NFPA’s argument that the harms alleged in the complaint are “impermissibly remote” is nothing more than an assertion that they were not foreseeable when NFPA promulgated and allegedly insisted on
 
                                                            -6-
 
maintaining the challenged standard. NFPA cannot avoid answering the claim for negligence merely because any physical harm would result from the actions of third-party manufacturers; since it was foreseeable that manufacturers would follow and implement the challenged standard, NFPA had a duty to ensure that doing so would not harm fire fighters. Cf. Mullins v. Pine Manor College, 389 Mass. 47, 54–55 (1983) (college had duty to take protect students against foreseeable risk of being attacked and raped by third parties).
The IAFF does not seek to hold NFPA liable for failing to control the conduct of turnout gear manufacturers, as NFPA contends. Instead, the IAFF alleges that NFPA was negligent in promulgating a standard that if followed would lead to the manufacture of gear that unnecessarily exposes fire fighters to carcinogens. The allegations in the complaint state a viable claim that NFPA owed the IAFF and its members a duty of care, and that NFPA’s alleged breach of that duty has caused harm.
3.2. Economic Loss Rule. NFPA’s assertion that the IAFF’s claim for negligence is barred by the economic loss doctrine is also without merit. That rule does not apply under the circumstances of this case.
“[T]he economic loss doctrine … provides that ‘parties bound by a contract may not pursue tort recovery for purely economic or commercial losses associated with the contract relationship.’ ” Lubin v. Allstate Vehicle and Property Ins. Co., 2021 WL 8999593, at * 1 (D.Mass. June 11, 2021) (Saris, J.), quoting Schafer v. Indymac Mortg. Services, 731 F.3d 98, 103 (1st Cir. 2013). Where it applies, this doctrine generally provides that “purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage.” Aldrich v. ADD Inc., 437 Mass. 213, 222 (2002), quoting FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993).
The purpose of the doctrine is “to prevent … tort concepts from undermining contract expectations,” on the theory that contracting parties are free to allocate the risk of economic loss as they see fit. Wyman v. Ayer Properties, LLC, 469 Mass. 64, 70 (2014); accord, e.g., Hunt Const. Group, Inc. v. Brennan Beer Gorman/Architects, P.C., 607 F.3d 10, 14 (2d Cir. 2010) (economic loss doctrine “serves to maintain the boundary between contract law, which is designed to enforce parties’ contractual expectations, and tort law, which is designed to protect citizens and their property” from physical harm”) (quoting Hamill v. Pawtucket Mut. Ins. Co., 892 A.2d 226, 228-229 (Vt. 2005)).
 
                                                            -7-
 
As a result, “[w]hen the economic loss rule has been applied, the parties usually were in a position to bargain freely concerning the allocation of risk[.]” Clark v. Rowe, 428 Mass. 339, 342 (1998).
But NFPA concedes that it had “no formal contract or relationship” with the IAFF.
The economic loss doctrine therefore does not apply here, because the IAFF had no opportunity to bargain with NFPA to allocate the risk of possible harm. See Wyman, 428 Mass. at 70–71 (inapplicable to claim that builder’s negligence damaged common areas of condominium building, where trustees had no contractual relationship with builder); City of Boston v. Purdue Pharma, LP, Suffolk Supr. Ct. No. 1884CV02860, 2020 WL 416406, at *9 (Mass. Supr. Jan. 3, 2020) (Sanders, J.) (inapplicable to claim that negligent provision of opioids caused substantial government costs); City of Boston v. Smith & Wesson Corp., Suffolk Supr. Ct. No. 199902590, 12 Mass. L. Rptr. 225, 2000 WL 1473568, at *9 (Mass. Super. July 13, 2000) (Hinkle, J.) (inapplicable to claim that negligent provision of firearms caused substantial government costs).[3]
4. Joinder. Finally, NFPA contends that because the IAFF seeks to enjoin NFPA from maintaining or enforcing the challenged standard, and NFPA insists that it “has no powers of enforcement,” government entities that require compliance with the standard are indispensable parties and the action must be dismissed if they are not joined. This argument is also without merit.[4]
If the IAFF were to prevail, it may be entitled to injunction relief requiring NFPA to repeal or modify the challenged standard. That relief would not
 
--------------------------------------------
 
[3] See also Sullivan v. Pulte Home Corp., 306 P.3d 1, 3 (Ariz. 2013) (doctrine does  not apply to non-contracting parties); Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n, 771 F.3d 1230, 1242 (10th Cir. 2014) (under Colorado law, doctrine does not apply “[w]hen claims arise from a non-contractual duty”); Cummings v. Carroll, No. COA19-283, 2020 WL 1016839, at *8 (N.C. Ct. App. Mar. 3, 2020) (doctrine does not apply when parties have no contractual privity and defendant’s duty to plaintiff is not established by contract).
[4] NFPA also argues that the IAFF may not press its claim for civil conspiracy without joining all alleged co-conspirators. As discussed above, the Court has concluded that it must dismiss the conspiracy claim on other grounds. In any case, this argument is wrong. Mass. R. Civ. P. 19(a) “was not intended to change the common law under which a plaintiff could elect between joining joint tortfeasors in one action or suing them separately” or, of course, suing one but not the others. See Mongeau v. Boutelle, 10 Mass. App. Ct. 246, 253 (1980).
 
                                                            -8-
 
implicate the rights of any government entity that may require compliance with NFPA’s standards. Since relief may be granted against the defendant that is before the court, without “affect[ing] the rights of those who are not,” any missing parties “are not indispensable parties.” Franks v. Markson, 337 Mass. 278, 284 (1958); accord Kitras v. Town of Aquinnah, 64 Mass. App. Ct. 285, 291- 296, rev. denied, 445 Mass. 1109 (2005) (Federal agency with legal interest in subject matter of State civil action not an indispensable party where relief may be granted against existing defendant without infringing legal rights of Federal agency).
ORDER
Defendants’ motion to dismiss is allowed in part as to the claim for civil conspiracy, and denied in part as to the claims for violation of G.L. c. 93A, § 11, and for negligence.
@/s/Kenneth W. Salinger
Justice of the Superior Court
@March 5, 2024
 
xxz
 
 
@SUFFOLK, ss.
@2284CV02906-BLS2
@NADER SIDHOM v. WILLIAM DALY SR., BERNARD KENNEY JR., ELIZABETH BRULPORT, WILLIAM DALY JR., THOMAS DALY, AND OTHERS [1]
@DECISION AND ORDER ON THE INDIVIDUAL DEFENDANTS’ MOTION TO DISMISS ALL CLAIMS AGAINST THEM
Nader Sidhom is a minority owner of affiliated limited liability companies that operate Dunkin’ franchises in Southeastern Massachusetts. When Sidhom purchased his interest, the business was controlled by William Daly Sr. (“William Sr.”), Bernard Kenney Jr. (“Kenney”), Elizabeth Brulport (“Brulport”), William Daly Jr. (“William Jr.”), and Thomas Daly (“Thomas”) (collectively the “Individual Defendants”). It is now controlled by Brulport, William Jr., and Thomas (the “Daly Children”) Sidhom claims that the Individual Defendants conspired to freeze him out of this business, in violation of their contractual obligations and fiduciary duties.
The Individual Defendants have moved to dismiss all claims against them under Mass. R. Civ. P. 12(b)(6). They do not challenge the breach of contract claim as asserted against Daly/Kenney Group LLC in count VIII of the first amended complaint.[2] The Court will deny the motion as to certain claims, but will dismiss the other claims against the Individual Defendants.
The motion to dismiss is denied in part as to: (I) the derivative claims on behalf of the LLCs (in count IX) that the Daly Children improperly caused the LLCs to increase their guaranteed payments without proportionately increasing Sidhom’s guaranteed payments, and that all Individual Defendants breached contractual and fiduciary obligations by extending Ourly Grind LLC’s
 
--------------------------------------------
 
[1] Daly/Kenney Group, LLC; Annual Grind, LLC; Biweekly Grind, LLC; Century Grind, LLC; Daly Grind, LLC; Decade Grind LLC; Eon Grind LLC; Future Grind LLC; Infinity Grind, LLC; Instant Grind, LLC; Millenium Grind, LLC; Minute Grind, LLC; Moment Grind, LLC; Monthly Grind, LLC; Ourly Grind, LLC; Second Grind, LLC; Weekly Grind, LLC; and Yearly Grind, LLC.
[2] Sidhom seeks certain declaratory relief as to all defendants. Other than that,  and the contract claim against Daly/Kenney Group in count VIII, the LLCs are only nominal defendants with respect to the derivative claims in count IX.
 
                                                            -1-
 
property lease and causing it to continue to pay above-market rental rates; (ii) the direct claim (in count X) that the Daly Children are liable to Sidhom on a theory of civil conspiracy to breach fiduciary duties for disproportionately increasing their guaranteed payments; and (iii) the parts of the declaratory judgment claim (count XI) about the increased guaranteed payments for the Daly Children or the extension of Ourly Grind’s lease.
The motion is allowed in part as to all other claims against the Individual Defendants, including: (I) the claims that Sidhom was entitled to distributions on a priority basis until his Invested Capital was returned; (ii) the claims regarding the transfer of ownership interests from William Sr. and Kenney to the Daly Children, including the claims regarding negative capital account balances at the time of those transfers; (iii) the direct claims (in counts V and X) that the Individual Defendants are liable to Sidhom for extending Ourly Grind’s lease; (iv) the additional claims against William Sr. and Kenney for breach of the implied covenant of good faith and fair dealing (count VI) and for breach of fiduciary duty (count VII); and (v) the remaining parts of the conspiracy claim (count X) and the declaratory judgment claim (count XI).
These partial dismissals will be without prejudice to Sidhom seeking leave to further amend his complaint to assert a claim against William Jr. and Thomas for breaching their alleged oral promise to give Sidhom a pro rata share of any ownership interests transferred by William Sr. when he retired.
1. Background. The following background facts are alleged in Sidhom’s complaint or established by contracts that Sidhom refers to in his complaint.[3]
In September 2010, Sidhom paid $1 million to buy a 10 percent membership interest in the Daly/Kenney Group LLC and fifteen affiliated LLCs (the “DKG Massachusetts LLCs”) that operate Dunkin’ franchises in or near New Bedford, Massachusetts, or own the real estate from which the franchises operate. Later on, Sidhom also obtained a 10 percent interest in a related Delaware company called Frequent Grind LLC, which was formed to operate a new Dunkin’ location within a gas station in New Bedford.
--------------------------------------------
 
[3] The Court may consider these contracts in deciding the motion to dismiss because Sidhom referred to them in, and relied upon them in framing, his amended complaint. See Lanier v. President and Fellows of Harvard College, 490 Mass. 37, 44 (2022) (documents referenced in complaint); Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004) (document relied upon in framing complaint).
 
                                                            -3-
 
The Individual Defendants owned the rest of the membership interest in Daly/Kenney Group, the DKG Massachusetts LLCs, and Frequent Grind. Later on, William Sr. and Kenney transferred their ownership interests to Brulport, William Jr., and Thomas, who are William Daly Sr.’s biological children.[4]
Daly/Kenney Group is the management company for the DKG Massachusetts LLC and for Frequent Grind. The DKG Massachusetts LLCs and Daly/Kenney Group all use the same form of operating agreement. (The Court will refer to these agreements as the “MA-LLC Agreements,” and sometimes cite to particular provisions as “MA-LLC Agmts. ¶ xx”). Frequent Grind has a different form of operating agreement.
2. Claims Regarding Distributions. Sidhom claims that the Individual Defendants deprived him of profit distributions to which he was entitled under the MA-LLC Agreements and the Subscription Agreement, and that the Daly Children paid themselves extra money without making a proportionate increase in payments to Sidhom as required under the Subscription Agreement.
The Court finds that these contracts are unambiguous. Their meaning is therefore a question of law that the Court may resolve in deciding the pending motion to dismiss.[5] Whether language used in a contract “is ambiguous is also a question of law for the court.”[6] Even contracts that are a bit convoluted or hard to parse may be unambiguous.[7] And the fact that the parties disagree about how to read their contracts does not make them ambiguous either.[8]
 
--------------------------------------------
 
[4] Sidhom admits this fact in his written opposition by referring to Elizabeth, William Jr., and Thomas as the “Daly Children.”
[5] See Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007) (affirming dismissal of contract claim); accord Flomenbaum v. Commonwealth, 451 Mass. 740, 751-752 & n.12 (2008) (granting motion to dismiss because plain language of contract made clear that Commonwealth could terminate chief medical examiner before completion of five-year term).
[6] Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 270, rev. denied, 440 Mass. 1101 (2003) (ordering dismissal of complaint for failure to state a viable claim for breach of contract).
[7] See Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 443 (2006) (“difficulty in comprehension does not equate with ambiguity”) (quoting Mass. Prop. Ins. Underwriting Ass'n v. Wynn, 60 Mass. App. Ct. 824, 827 (2004)).
[8] See Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795 (2010) (“ambiguity is not created simply because a controversy exists between parties,
<continued…>
 
                                                            -3-
 
2.1. Alleged Violation of Operating Agreement § 4.01(b). Starting with the MA-LLC Agreements, Sidhom claims (in counts I, IV, and IX) that the Individual Defendants violated those operating agreements by failing to make cash distributions to him “on a priority basis to return his invested capital.” This claim fails because the plain language of the governing contracts makes clear that Sidhom was not entitled to distributions on a priority basis.
Sidhom relies on a provision in the MA-LLC Agreements stating that any regular cash distributions approved by the Board of Managers, that do not arise from the disposition of the LLCs’ property, must first be distributed as a return of Members “Invested Capital” (a defined term). See MA-LLC Agmts ¶ 4.01(b). Additional cash may be distributed to all Members, in proportion to their percentage membership interests, only after the full amount of each Member’s Invested Capital has been returned. Id. ¶ 4.01(c). Sidhom asserts that distributions were made to other members before his Invested Capital was returned, and that this violated ¶ 4.01(b).
But Sidhom expressly agreed in the Subscription Agreement that ¶ 4.01(b) of the MA-LLC Agreements does not apply to him. Since the Subscription Agreement and the MA-LLC Agreements are “interlocking documents” that are “interrelated in purpose,” the Court must read them together.[9]
The Subscription Agreement trumps any inconsistent provisions in the MA-LLC Agreements. The first numbered paragraph of the Subscription Agreement says that Sidhom’s Membership Interests are “subject to the terms set forth in Exhibit B.” The preamble to Exhibit B reiterates that Sidhom’s purchase of membership interests in DKG Massachusetts LLCs and Daly/Kenney Group “will be subject to the following terms.” And paragraph 7 of Exhibit B says that if there is any conflict between the MA-LLC Agreements and the terms of Exhibit B, then Exhibit B shall control.
What controls here is the provision in Exhibit B stating that, “Article 4.01(b) of the Operating Agreement shall not be applied to any distribution to members in which the purchaser participates.” See Subsc. Agmt. Ex. B, ¶ 5, last sentence. This provision means what it says. The provision upon which Sidhom relies, MA-LLC Agmts. ¶ 4.01(b), does not apply to any cash distribution in which
 
--------------------------------------------
 
each favoring an interpretation contrary to the other’s”) (quoting  Jefferson Ins. Co. v. Holyoke, 23 Mass. App. Ct. 472, 475 (1987)).
[9]        Cf. Matthews v. Planning Bd. of Gloucester, 72 Mass. App. Ct. 456, 463 (2008), quoting Striar v. American Medical Intern., Inc., 45 Mass. App. Ct. 87, 95 (1998).
 
                                                            -4-
 
Sidhom participates, meaning that Sidhom has no contractual right to priority cash distributions and a return of his Invested Capital.
In his written opposition, Sidhom asserts that the sentence in Subsc. Agmt. Ex. B ¶ 4.01(b) is contained in a paragraph that is “completely limited to a short duration,” and therefore no longer applies. That is incorrect. Sidhom misreads the Subscription Agreement.
Only the first two sentences of ¶ 5 to Exhibit B apply for a limited time. The first sentence says that Sidhom is not entitled to receive any distribution of profits or losses until 21 months after his initial purchase, or until Daly/Kenney Group and its affiliates pay off two outstanding bank loans, whichever comes first. The second sentence says that, “prior to the time when” Sidhom is entitled to profit distributions, other members may continue to receive such distributions.
In contrast, the last two sentences of ¶ 5 are not time limited, and continue in effect. The third sentence says that Sidhom is entitled to distributions that result from a Capital Transaction or are approved by a Majority of the Members. And the fourth sentence is the provision stating that ¶ 4.01(b) of the MA-LLC Agreements does not apply to Sidhom.
If the contracting parties had intended for the last sentence of ¶ 5 to apply only during the period when Sidhom was not entitled to participate in profit or loss distributions, they would have said so. For example, they could have included this as part of the second sentence, which expressly applies only “prior to the time when” Sidhom is entitled to profit distributions.
By instead putting this provision in a separate sentence that does not say it is time-limited, the parties made clear that it continues in effect after Sidhom became eligible to participate in profit distributions—meaning that he would never have a right to receive profits first, ahead of other Members, until his Invested Capital was completely returned. The plain and unambiguous language of the last sentence of ¶ 5 of Exhibit B “must be enforced according to its terms.” See A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 479 Mass. 419, 428 (2018), quoting Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).
Since Sidhom has not stated a viable claim that distributions were made in violation of the MA-LLC Agreements in count I of his complaint, he has also not stated a viable claim under G.L. c. 156C, § 35, in count IV. By its terms, § 35
 
                                                            -5-
 
applies only where an LLC makes distributions in violation of its operating agreement.
2.2. Alleged Violation of Subscription Agreement Ex. B, ¶ 6. Turning to the Subscription Agreement, Sidhom claims (in count VIII) that the Daly Children violated this contract by almost doubling their weekly guaranteed payments while increasing Sidhom’s payments by less than 30 percent. Sidhom contends that the Subscription Agreement gives him a contractual right to a proportionate increase in his own payments whenever “one or more” other members receive any increase in their payments.
These allegations may support a viable claim for breach of contract against Daly/Kenney Group, the party that entered into the Subscription Agreement with Sidhom. And they may give rise to a claim against the Daly Children for conspiracy to breach fiduciary duty, as discussed below.
But Sidhom cannot sue the Daly Children for breaching the Subscription Agreement because they are not parties to that contract.[10] See Clark v. Mead Realty Group, Inc., 67 Mass. App. Ct. 491, 498 (2006) (rights and obligations flowing from agreement between contracting parties “do not create a contract binding” a related entity that is not a party to the contract); see also United Tool & Indus. Supply Co. v. Torrisi, 356 Mass. 103, 106–108 (1969) (though contract for sale of business generally includes implicit promise by seller not to compete, no such implied term may not be enforced against selling shareholders who were not parties to the contract).
2.3. Alleged Conspiracy to Breach Fiduciary Duty as to Guaranteed Payments. Though Sidhom cannot sue the Daley Children for breaching the Subscription Agreement, he has stated a plausible claim (as part of count X) that the Daly Children conspired to breach their fiduciary duties to Sidhom by approving increases in their own guaranteed payments without approving a proportionate increase in Sidhom’s guaranteed payments.
 
--------------------------------------------
 
[10] Though William Sr. and Kenney accepted the Subscription Agreement on behalf of Daly/Kenney Group LLC, in their capacities as its Managers, that does not make them parties to that contract either. An agent or owner of a business entity may not be sued or held liable for breach of a contract that they enter into on behalf of the business, if the agent or owner is not a party to the contract. See Porshin v. Snider, 349 Mass. 653, 655 (1965); Henry W. Savage, Inc. v. Friedberg, 322 Mass. 321, 323–324 (1948); Marshall v. Status Pharmaceuticals, Inc., 51 Mass. App. Ct. 667, 670–673 (2001).
 
                                                            -6-
 
Sidhom alleges that the Daly Children were acting as managers of Daly/Kenney Group when they increased their own weekly guaranteed payments. This allegation plausibly suggests that the Daly Children had a fiduciary duty to Sidhom, a minority member, including a duty to ensure that Daly/Kenney Group complied with its contractual obligation to increase Sidhom’s guaranteed payments by the same proportion.[11]
As managing members of closely-held LLCs, the Individual Defendants owed fiduciary duties of good faith and loyalty to Sidhom.  See Pointer,  455 Mass. at 549–551 (members and non-member manager of closely held LLC owed fiduciary duty to minority member and to company, just like stockholders in closely-held corporation); accord Butts v. Freedman, 96 Mass. App. Ct. 827, 829 (2020); see also Allison v. Eriksson, 479 Mass. 626, 627 (2018) (G.L. c. 156C, § 63(b) “provides that members of a limited liability company owe each other fiduciary duties,” subject to restriction in operating agreement).
The Subscription Agreement provides that, “[i]n the event that Company increases the Guaranteed Member Payment to one or more members, the Guaranteed Member Payment to purchaser will increase proportionately.” Subsc. Agmt. Ex. B, ¶ 6.
This provision means what it says. If a guaranteed payment to any one member is increased (say by 50 percent), then Sidhom is entitled to a matching increase in his guaranteed payment in the same proportion (the same 50 percent, in this example).
Defendants’ assertion that this provision instead requires that Sidhom shall continue to receive the same percentage of the total of all guaranteed payments, even if the total is increased, is without merit. That is not what the contract says.
Failure to pay Sidhom proportional distributions to which he is entitled by contract may constitute a breach of fiduciary duty. See Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 536 (2014) (“Freeze-outs can occur … ‘[w]hen the reasonable expectations of a [minority] shareholder are frustrated.’ “) (quoting Pointer, 455 Mass. at 550); see also Clemmer v. Cullinane, 62 Mass. App. Ct. 904, 905–906 (2004) (rescript) (minority owner of closely-held corporation may sue
 
--------------------------------------------
 
[11] To survive a motion to dismiss under Rule 12(b)(6), a complaint must make factual allegations that, if true, would “plausibly suggest … an entitlement to relief.” Lopez v. Commonwealth, 463 Mass. 696, 701 (2012),  quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and Bell Atl. Corp.  v. Twombly,  550 U.S. 544, 557 (2007).
 
                                                            -7-
 
for breach of fiduciary duty based on allegation that corporate fiduciary kept corporate benefits for themselves while denying them to minority owner) (applying Delaware law).
To the extent that Sidhom is seeking to obtain extra payments for himself as a remedy, this is properly asserted as a direct claim (in count X), because Sidhom claims that the Individual Defendants violated a duty that they owed to Sidhom personally, and that he has suffered an injury not shared by the business entities or their other Members. See International Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci, 476 Mass. 553, 557–562 (2017). To the extent that Sidhom is seeking an alternative remedy requiring the Daly Children to repay part of their distributions to the LLCs, he must seek this relief through a derivative claim (in count IX) on behalf  of the LLCs.  See  Fronk v.  Fowler,  456 Mass. 317, 332 n.23 (2010).
2.4. No Waiver of Fiduciary Duties as Managers. Sidhom’s claims that any of the Individual Defendants breached or conspired to breach a fiduciary duty while they or their alleged co-conspirators were acting in their capacities as Managers, , including the claim discussed above regarding allegedly disproportionate distributions, are not barred by the limited contractual waiver of fiduciary obligations. Although the MA-LLC Agreements provide that Members have no fiduciary obligations when acting in their capacity as Members, that provision does not extinguish fiduciary duties of Managers acting in their capacity as Managers—even if the Managers are also Members.
A contractual disclaimer of fiduciary duties in an LLC operating agreement is enforceable. See G.L. c. 156C, § 63(b) (LLC member’s or manager’s fiduciary duties “may be expanded or restricted” by operating agreement). This statute codifies for LLCs the common law rule that corporate shareholders may agree by contract to alter or limit their duties to one another or to the company. See Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 598 n.24 (1975); Butts, 96 Mass. App. Ct. at 829–830. A contract among the shareholders or members will “supplant the otherwise applicable fiduciary duties of parties in a close corporation” or LLC where it “clearly and expressly indicate[s] a departure from those obligations.” Selmark Assocs., 467 Mass. at 539.
The MA-LLC Agreements provide in ¶ 6.10(b) that “No Member shall be a fiduciary of or have any fiduciary obligations to the other Members.”
But the term “Member” is defined to mean an LLC Member “in such person’s capacity as a Member of the LLC.” The term “Manager” is similarly defined to
 
                                                            -8-
 
mean a Manager of the LLC “in each such person’s capacity as (and for the period during which such person serves as) a Manager of the LLC.”
Given these definitions, the contractual disclaimer in ¶ 6.10(b) waives potential liability for breach of fiduciary duty by a Member only when they are acting in their capacity as a Member; it does not disclaim fiduciary obligations where a Member acts in their capacity as a Manager. Compare 77 Charters, Inc. v. Gould, No. CV 2019-0127-JRS, 2020 WL 2520272, at *11 (Del. Ch. May 18, 2020) (waiver of liability for anyone acting in their “capacity as a Member (including the Managing Member and its Affiliates)” did not limit liability of member acting in its capacity as a Managing Member).
3. Claims re Transfer of Daly Sr.’s and Kenney’s Membership Interests. Sidhom challenges the transfers by William Sr. and Kenney of their ownership interests to the Daly Children on several grounds.
3.1. Transfer of Daly Sr.’s Membership Interests. The Court will first address Sidhom’s challenge to the transfers by William Sr.
3.1.1. Failure to Obtain Sidhom’s Consent. Sidhom claims (in count X) that the Individual Defendants conspired to breach their fiduciary duties by failing to obtain Sidhom’s consent to William Sr. transferring his membership interests to the Daly Children. This claim fails as a matter of law.
No approval of this transfer was required under MA-LLC Agmts. ¶ 8.01(a), because ¶ 8.04 provides that Members may transfer their ownership interests to any Immediate Family member without obtaining approval of the Board of Managers or any other Member under ¶ 8.01(a). “Immediate Family” is defined to include one’s “issue.” Sidhom concedes that each of the Daly Children is part of William Sr.’s “Immediate Family.”
Sidhom contends that approval was nonetheless required under ¶ 8.01(b) because Daly Sr. transferred all membership rights, rather than only the economic rights of membership. The Court is not persuaded.
Paragraph 8.01(b) approval is required only where the assignee of the interest of a Member seeks to become a “substituted Member.” The Daly Children were already Members of the LLCs; they were not trying to become “substituted Members.” Sidhom asks the Court to read ¶ 8.01(b) as requiring approval if an existing Member seeks to be substituted “with respect to the transferred membership interest.” But that phrase does not appear in the contract.
 
                                                            -9-
 
The Court may not revise ¶ 8.01(b) by reading into it a provision that the contracting parties did not include. See Automile Holdings, LLC v. McGovern, 483 Mass. 797, 817 (2020) (“We cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its plain terms.”) (quoting National Med. Care, Inc. v. Zigelbaum, 18 Mass. App. Ct. 570, 575–576 (1984)); Thomas P. Nichols & Son Co.  v.  National City  Bank  of Lynn, 313 Mass. 421, 427 (1943) (“A court cannot read into a contract an obligation that was not assumed.”); Acushnet Company v. Beam, Inc., 92 Mass. App. Ct. 687, 695 (2018) (“Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.”) (quoting Vermont Teddy Bear Co. v. 438 Madison Realty Co., 1 N.Y.3d 470, 475 (2004)).
3.1.2. Breach of Alleged Oral Promise. During the hearing on the Individual Defendants’ motion to dismiss, Sidhom raised a new argument that does not appear in his written opposition; Sidhom asserted for the first time that the transfer of William Sr.’s interests to the Daly Children violated an oral agreement that Sidhom was share in any such transfer. This argument appears to be based on allegations in ¶ 92 of the complaint that at some point, years earlier, Thomas and William Jr. assured Sidhom  that  he  would  receive  a pro rata share of William Sr.’s ownership interests when William Sr. retired.
The complaint does not include a claim for breach of this alleged oral promise. Nor does it clearly state what Thomas and William Jr. allegedly promised to do. And it makes no factual allegations plausibly suggesting that this alleged promise became contractually binding through offer, acceptance, and either consideration or reasonable reliance. As a result, the current complaint cannot be construed as stating a claim for breach of the alleged oral promise.[12]
 
--------------------------------------------
 
[12] “The foundational requirements of a valid contract are ‘offer, acceptance, consideration, and terms setting forth the rights and obligations of the parties.’ ” JPMorgan Chase & Co., Inc. v. Casarano, 81 Mass. App. Ct. 353, 356 (2012), quoting Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 720 (1999). “An oral contract, like any other, requires offer, acceptance, and consideration.” Vasconcellos v. Arbella Mut. Ins. Co., 67 Mass. App. Ct. 277, 280 (2006). Reliance may substitute for consideration in the formation of a binding contract. See Rhode Island Hosp. Trust Nat. Bank v. Varadian, 419 Mass. 841, 850 (1995); Johnny's Oil Co. v. Eldayha, 82 Mass. App. Ct. 705, 714 (2012). But a promise that is not supported either by consideration or by reliance is unenforceable. See, e.g., Congregation Kadimah Toras-Moshe v. DeLeo, 405 Mass. 365, 366–368 (1989).
 
                                                            -10-
 
If Sidhom wishes to assert a claim against Thomas Daly and William Daly Jr. for breach of this alleged oral promise, and believes that he can allege and then prove facts sufficient to establish all of the elements of such a claim, he should serve and file a motion to amend his complaint to add a claim for breach of the alleged oral promise.
The Individual Defendants’ argument that any claim based on this alleged oral promise is “foreclosed by the modification and integration clauses” in the MA- LLC Agreements appears to be without merit. The alleged oral promise is not a modification of the LLC operating agreements; instead, it is an alleged side agreement among Sidhom, Thomas, and William Jr. For much the same reason, the alleged oral promise would not be barred by the operating agreements’ integration clauses even if it had been made before Sidhom became a member, as it does not address the same subject matter as the MA-LLC Agreements. And, of course, if the alleged oral promise came after Sidhom became a party to the MA-LLC Agreements, than an integration clause concerning prior agreements or understands would not be implicated for that reason as well.
3.2. Transfer of Kenney’s Membership Interests. Sidhom also asserts claims concerning Kenney’s transfer of his membership interests to the Daly Children.
3.2.1. Express Contract Terms. Sidhom claims (in counts I and IX) that the transfer of Kenney’s interests with the approval of the Daly Children, but without obtaining Sidhom’s consent, violated the MA-LLC Agreements. He further claims that the Individual Defendants further violated those contracts by not exercising the LLCs’ rights of first refusal. This two-pronged claim fails as a matter of law, based on the plain language of the governing contracts.
Where approval of a transfer of membership interests is required under ¶ 8.01(a) of the MA-LLC Agreements, the Board of Managers—excluding any Manager that is seeking to transfer their interests, and any other Manager that is “affiliated with” them—must approve the transfer in writing. Paragraph 8.01(a) provides that the decision to grant or deny approval for a transfer “shall be in the Board’s absolute discretion.”
Kenney’s transfer to the Daly Children was approved by the other members of the Board of Managers. At that time, the Board consisted of Kenney, William Sr., William Jr., Thomas, and Brulport. The four Managers other than Kenney all approved this transfer. That satisfied the requirements of ¶ 8.01(a). No additional approval under ¶ 8.01(b) was required, for the reasons discussed above in § 3.1.1 of this decision.
 
                                                            -11-
 
Under the contractual definition of “Affiliate” in Art. I of the MA-LLC Agreements, neither William Sr. nor any of the Daly Children was affiliated with Kenney because they are not part of Kenney’s Immediate Family, and they neither controlled nor were controlled by Kenney.
Sidhom’s assertion that approval by the Daly Children should not count, because they were “conflicted managers in the transfers to themselves,” is without merit. The MA-LLC Agreements do not bar Managers who are potential recipients of a membership interest transfer from approving the transfer.
Paragraph 8.01(a) serves the important purpose ensuring that no Member may transfer their membership interest (other than to Immediate Family, a legal representative, or an Affiliate, as permitted under ¶ 8.04) without prior approval by the rest of the Board of Managers, excluding an Immediate Family member or other affiliate of the transferring Member.
But nowhere does this provision require that only disinterested Managers may approve a transfer. That is unsurprising. At the outset, the Board of Managers had only two members: William Daly Sr. and Bernard Kenney. Under Sidhom’s strained reading of the MA-LLC Agreements, William Sr. could never have transferred his shares to Kenney, and Kenney could never have transferred his shares to Daly Sr., because the recipient would have an interest in the proposed transaction. It makes good sense that when William Sr. and Kenney first entered into this form of LLC operating agreements, they did not require that only disinterested Managers could approve a transfer of membership interests.
When the contracting parties intended to require approval by a majority of the “disinterested Managers,” they said so expressly, as in ¶ 6.09 of the MA-LLC Agreements concerning approval of contracts between an LLC and a Member or their Affiliate. In contrast, ¶ 8.01(a) does not require that transfers of membership interests be approved by a majority of the disinterested Members. As noted above, the Court may not revise this provision by reading into it a requirement that the contracting parties did not include. See Automile Holdings, 483 Mass. at 817; Thomas P. Nichols & Son Co., 313 Mass. at 427; Acushnet Company, 92 Mass. App. Ct. at 695 (2018).
Sidhom’s further claim that the Individual Defendants committed a breach of contract by not exercising the LLC’s right of first refusal to purchase Kenney’s membership interests also fails as a matter of law. Though the MA-LLC Agreements create such a right of first refusal in ¶ 8.05(a), they go on to provide
 
                                                            -12-
 
in ¶ 8.05(g)(ii) that the Daly/Kenney Group and each of the DKG Massachusetts LLCs (acting, of course, through their Board of Managers) could waive those rights, in whole or in part, at any time. Since the Board of Managers was granted broad discretion to waive the LLCs’ rights of first refusal, it cannot constitute a breach of contract for the Managers not to exercise those rights.
3.2.2. Implied Covenant of Fair Dealing. It follows that the transfer of Kenney’s membership interests, and the decision not to have the LLCs exercise their right of first refusal to purchase those interests, could not have violated the implied covenant of good faith and fair dealing (as alleged in count II).
The implied covenant of good faith and fair dealing “does not create rights or duties beyond those the parties agreed to when they entered into the contract.” Boston Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs., 463 Mass. 447, 460 (2012) (affirming dismissal of claim), quoting Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 680 (2011). It only governs “the manner in which existing contractual duties are performed.” Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 289 (2007).
The factual allegations in Sidhom’s complaint do not plausibly suggest that the approval and handling of Kenney’s transfer of his membership interests violated the implied covenant. Though Sidhom makes the conclusory assertion that the Individual Defendants “engaged in intentional wrongdoing in bad faith” in connection with Kenney’s transfer of his membership interests, that does not suffice to state a viable claim. “Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.” Doe v. American Guar. & Liab. Co., 91 Mass. App. Ct. 99, 105 (2017), quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). “While ‘detailed factual allegations’ are not required at the pleading stage, mere ‘labels and conclusions’ will not survive a motion to dismiss.” Burbank Apartments Tenant Ass’n v.  Kargman, 474 Mass. 107, 116 (2016), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).
3.2.3. Breach of Fiduciary Duty and Civil Conspiracy. Similarly, since the MA-LLC Agreements expressly gave William Sr. and the Daly Children the “absolute discretion” to approve Kenney’s transfer of his membership interests to the Daly Children, and implicitly gave them similarly broad discretion not to exercise any LLC’s right of first refusal to purchase those interests, it follows that the Individual Defendants cannot be liable for breach of fiduciary duty (as alleged in count III) on these bases.
 
                                                            -13-
 
Under Massachusetts law, “[a] claim for breach of fiduciary duty may arise only where the agreement does not entirely govern the shareholder’s actions.” Merriam v. Demoulas Super Markets, Inc., 464 Mass. 721, 727 (2013); accord Selmark Assocs., 467 Mass. at 537–538. In other words, when a contested action “falls entirely within the scope of a contract,” any obligations derive from the contract and defendant’s conduct “is not subject to question under fiduciary duty principles.” Selmark, supra, quoting Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007).
The mere fact that the Daly Children had an interest in Kenney being able to transfer his membership interests to them does not, standing alone, support a claim against them for breach of fiduciary duty. So long as the owners or managers of a closely-held corporation or LLC are “acting within a proper course of corporate conduct,” they are entitled to exercise “their right to ‘selfish ownership’ ” and make decisions from which they will benefit. O’Brien v. Pearson, 449 Mass. 377, 390 (2007), quoting Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 850-851 (1976). And, as discussed above, the MA-LLC Agreements permitted the Daly Children to approve Kenney’s’ transfers.
3.3. Negative Capital Account Balances. Sidhom claims (in counts V and IX) that William Sr. and Kenney breached the MA-LLC Agreements by failing to pay the LLCs enough money to bring their negative capital accounts to zero at the time that they transferred their membership interests to the Daly Children. This claim fails as a matter of law, under the plain language of these contracts.
Paragraph 3.02(c) of the MA-LLC Agreements provides that, if a Member’s capital account has a negative balance, and there is a “termination of the LLC” or a “termination of that Members ownership interest in the LLC,” then the Member must pay the LLC enough money to bring their capital account to a “zero or neutral balance.”
The factual allegations in the complaint do not plausibly suggest that this provision was triggered. William Sr. and Kenney transferred their membership interests to the Daly Children. The transfers did not “terminate” these ownership interests; to the contrary, the same membership interests continued to exist, but now belonged to different people. A “termination” is what would happen if the LLCs exercised a right of first refusal to pay a transferring member the fair market value of their interest, and then “liquidated” that interest. See MA-LLC Agmts ¶¶ 8.05(a) and (e). If a membership interest is “liquidated,” then it no longer exists; in other words, it is terminated. But the
 
                                                            -14-
 
“transfer” of membership interests to the Daly Children did not “terminate” those interests.
If the contracting parties had intended to require restoration of negative account balances in the event that a Member “transfers” their ownership interests to someone else, they would have said so.
Sidhom’s allegations that he told the Individual Defendants that if William Sr. and Kenney transferred their interests then they would have to bring their capital account balances back up to zero, and that the Individual Defendants never disagreed, is beside the point. The Court finds that the relevant provisions in the MA-LLC Agreements are unambiguous. As noted above, the plain and unambiguous contract language “must be enforced according to its terms.” A.L. Prime, 479 Mass. at 428, quoting Schwanbeck, 412 Mass. at 706.
Even assuming that at some point the Individual Defendants mistakenly believed that William Sr. and Kenney were required to restore their capital accounts at the time they transferred their ownership interests, that belief could not change the plain meaning of the  MA-LLC Agreements.  See  Eigerman, 450 Mass. at 288 n.8 (parties’ alleged “practical understanding” of how their agreement should be implemented cannot trump unambiguous contract language); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 147 n.9 (2007) (parties’ subjective understanding of contract terms cannot create ambiguity); accord Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779, 791–792 (1996).
4. Claims re Lease Extension. The first amended complaint alleges that Ourly Grind, LLC (which is one of the DKG Massachusetts LLCs) leases space from Daly-Kenney Realty LLC, which Sidhom contends is an “Affiliate” of the Individual Defendants as that term is defined in the MA-LLC Agreements.
Sidhom claims (in counts V and IX) that William Sr. and Kenney breached the MA-LLC Agreements by causing Ourly Grind LLC to exercise an option to extend that lease without obtaining required approval from other Managers. And he similarly claims (in counts IX and X) that the Individual Defendants breached or conspired to breach fiduciary duties by “failing to obtain Sidhom’s consent to … the extension of the Ourly Grind lease on terms not reasonably comparable to those offered by third parties.”
Sidhom relies on two provisions in the MA-LLC Agreements. Paragraph 6.07(ii) requires written consent by Members that own at least 50 percent of Ourly Grind LLC before that entity may “enter into any agreement or
 
                                                            -15-
 
arrangement” with an Affiliate of a Member—other than “Affiliates in which either the LLC or all the Members have an interest.” In addition, ¶ 6.09 further provides that, before the LLC may either “engage in business with” or “enter into” a contract with an affiliate of a Member, it must obtain “approval of a majority in number of disinterested Managers” and must ensure that any payments required under the contract are “reasonably comparable to those that would be payable to unaffiliated persons under similar agreements.”
Sidhom contends that the Individual Defendants caused Ourly Grind to exercise an option to extend its lease in violation of these contract provisions because the extension was not approved by the Members or by the disinterested Members, and because the rent charged under the lease is far above market rates.
Sidhom has not stated a viable claim for violation of ¶ 6.07(ii), because no Member or managerial approval was required to exercise an existing option to extend an existing lease. Exercising an option to extend an existing lease does not constitute “entering into” a contract.
In contrast, Sidhom has stated a viable claim against the Individual Defendants for breach of ¶ 6.09. The approval of disinterested Managers is required not only before one of the LLCs “enters into” a contract with an Affiliate of a Member, but also before it “may engage in business with” such an Affiliate.
The plain language of this provision makes clear that “engaging in business” is broader and encompasses more activities than “entering into a contract.” If one were to construe these two distinct references in ¶ 6.09 as meaning the same thing, that would make superfluous the reference to engaging in business, which is not an appropriate way to read an unambiguous business contract. See, e.g., Lieber v. President and Fellows of Harvard College, 488 Mass. 816, 823 n.15 (2022) (“every word and phrase” of contract should be “given meaning, and none is to be rejected as surplusage if any other course is rationally possible”) (quoting Tupper v. Hancock, 319 Mass. 105, 109 (1946)).
Exercising an option to extend an existing lease with an Affiliate of the Individual Defendants constitutes “engaging in business” with the Affiliate. As a result, the complaint states a viable claim that the Individual Defendants needed to obtain Sidhom’s approval before extending Ourly Grind’s lease.
This claim for breach of contract must be asserted as a derivative action (in count IX) because it seeks to remedy alleged harm to Ourly Grind LLC itself.
 
                                                            -16-
 
See Fronk, 456 Mass. at 332 n.23. Sidhom is not entitled to assert this claim for relief as a direct action on his own behalf (in counts V and X); the Court will therefore dismiss those parts of counts V and X.
Sidhom has also stated a viable claim for breach of fiduciary duties by allegedly allowing Ourly Grind to keep paying above-market rates to Daly-Kenney Realty. Separate and apart from the contractual requirement that continuing to “engage in business with” this Affiliate had to be approved by the disinterested Managers, Sidhom has alleged facts plausibly suggesting that the Individual Defendants worked together to breach fiduciary duties by causing Ourly Grind to keep paying Daly-Kenney Realty excessive rental rates. Once again, however, this must be asserted as a derivative claim on behalf of Ourly Grind (in count IX). See Fronk, supra. It may not be asserted as a direct claim on behalf of Sidhom (in count X); the Court will therefore dismiss that part of count X.
Since Sidhom alleges that the Individual Defendants acted or failed to act with respect to the Ourly Grind lease extension in their capacity as Managers, the contractual disclaimer of fiduciary duties for Members acting in their capacity as Managers does not bar this claim, as explained above in § 2.4 of this decision.
5. Other Implied Covenant and Fiduciary Duty Claims against William Sr. and Kenney. In addition to the claims discussed above, Sidhom alleges that William Sr. and Kenney did or failed to do five other things that Sidhom claims violated the implied covenant of good faith and fair dealing in the MA-LLC Agreements (count VI) or constituted breaches of fiduciary duty (count VII). None of these allegations plausibly suggest that Sidhom is entitled to relief against William Sr. or Kenney under either of these theories.
First, though Sidhom alleges that at some point William Sr. made inaccurate and misleading statements that his capital account balances were not negative, Sidhom alleges no facts plausibly suggesting that he was injured as a result, or that he did or failed to do anything in reliance on William Sr.’s statements. Harm or injury is an element of a claim for breach of contract or breach of fiduciary duty. See, e.g., Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016) (breach of contract); Eisenstein v. David G. Conlin, P.C., 444 Mass. 258, 267 (2005) (breach of fiduciary duty).
The Court has determined that William Sr. had no contractual obligation to contribute funds to bring his negative capital account balances to zero when he transferred his ownership interests to his children, as explained in § 3.3, above.
 
                                                            -17-
 
It follows that Sidhom suffered no compensable harm if William Sr. incorrectly said that his capital accounts did not have negative balances.
Second, Sidhom’s allegation that William Sr. and Kenney failed to provide Sidhom with information that he requested in connection with their plans to transfer their ownership interests does not state an actionable claim either.
Sidhom does not point to any express contractual obligation to provide him with the requested information. It follows that the alleged failure by William Sr. and Kenney to provide that information could not have violated the implied covenant, because the implied covenant does not impose substantive obligations not created by the express terms of a written contract. See, e.g., Boston Med. Ctr. Corp., 463 Mass. at 460. “Simply put, ‘the implied covenant of good faith and fair dealing cannot create rights and duties that are not already present in the contractual relationship.’ ” A.L. Prime, 479 Mass. at 435, quoting Eigerman, 450 Mass. at 289.
The fiduciary duty claim concerning this alleged failure to provide information fails because William Sr. and Kenney were acting in their capacities as Members when they transferred their ownership interests, and Sidhom alleges no facts plausibly suggesting that they were instead acting in their capacity as Managers. As discussed above in § 2.4 of this decision, Sidhom agreed by contract that William Sr. and Kenney did not owe him any fiduciary duty for things they may do or fail to do in their capacities as Members.
Third, Sidhom’s allegation that William Sr. and Kenney told Sidhom that he could not participate in the Frequent Grind LLC if he did not execute a new form of operating agreement for this new entity, and that this “economic threat” had the effect of “forcing” him to accept a new contract that “materially and adversely affected his rights” compared to the form of the prior MA-LLC Agreements, does not state a viable claim either.
Sidhom’s factual allegations do not plausibly suggest that the Frequent Grind LLC was the result of economic duress. Merely urging another party to accept a deal that is less generous than they would like, and threatening not to do business with them if they do not, is not economic duress (even if the demand is made of someone in difficult financial circumstances). See Boston Med. Ctr. Corp., 463 Mass. at 464 & 468–469; Cabot Corp. v. AVX Corp., 448 Mass. 629, 638– 639 (2007). “Hard bargaining is not unlawful; it is ‘not only acceptable, but indeed, desirable, in our economic system, and should not be discouraged by
 
                                                            -18-
 
the courts.’ ”Cabot Corp., supra, at 639, quoting 13 S. Williston, Contracts § 71.7, at 450 (3d ed. 1970).
Even if Sidhom had alleged facts plausibly suggesting that he was compelled to accept the Frequent Grind operating agreement under economic duress, and had done so in a timely manner, that would only have been a basis for Sidhom getting out of that contract and giving up his membership interest in that LLC. “[E]conomic duress renders a contract voidable, not void.” Boston Med. Ctr., 463 Mass. at 468. Sidhom did not have the option of accepting parts of the contractual arrangement and selectively voiding or revising others. “[U]nless rescinded ‘a voidable contract imposes on the parties the same obligations as if it was not voidable.’ ” Berenson v. French, 262 Mass. 247, 260-261 (1928), quoting Williston, Contracts, § 15 (1920).
But by the time that Sidhom brought this lawsuit it was far too late to challenge the Frequent Grind operating agreement on the ground that it was the product of duress. The factual allegations in the complaint indicate that Sidhom signed the new operating agreement and accepted the benefits of being an owner of Frequent Grind for almost three years before claiming that he acted under duress.[13] The complaint therefore establishes that Sidhom ratified the contract and thereby waived any claim of duress. See Cabot Corp., 448 Mass. at 642–646. “A party may ratify an agreement entered into under duress” in several ways, including by “intentional accepting benefits under the contract” or “by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it.” Id. at 643, quoting In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989). A party claiming duress must “disclaim the contract … promptly or be held to have forfeited his right to do so.” Id., quoting VKK Corp. v. National Football League, 244 F.3d 114, 123 (2d Cir. 2001).
In any case, even if Sidhom had not ratified the contract by accepting the benefits of ownership in Frequent Grind for years, the allegation that Sidhom was pressured or even “forced” to accept the Frequent Grind operating agreement cannot serve as the basis for any claim seeking monetary compensation (or “damages”). Massachusetts has not recognized “duress” as an independent cause of action for damages. See Leventhal v. Dockser, 361 Mass. 894 (1972) (rescript). As noted above, a contract entered into under physical or economic duress that “deprives the victim of his unfettered will” is voidable.
 
--------------------------------------------
 
[13]      Sidhom alleges that he signed the Frequent Grind operating agreement in early 2020. He did not file this civil action under December 22, 2022.
 
                                                            -19-
 
Cabot Corp., 448 Mass. at 637. But if the contract is neither voidable nor rescinded, then the party cannot seek damages on the theory that the contract was the product of duress. See generally Restatement (Second) of Contracts, Introductory Note to §§ 174-177 (1981) (“Since duress and undue influence, unlike deceit, are not generally of themselves actionable torts, the victim of duress or undue influence is usually limited to avoidance and does not have an affirmative action for damages.”).
Sidhom’s claim that William Sr. and Kenney violated the implied covenant of good faith and fair dealing in connection with getting Sidhom to execute the Frequent Grind operating agreement also fails for the additional reason that this covenant “pertains to bad faith in the performance of a contract, not in its execution.” Sheehy v. Lipton Indus., Inc., 24 Mass. App. Ct. 188, 194 n.6 (1987).
Fourth, Sidhom cannot sue William Sr. and Kenney based on their failed attempt to replace the MA-LLC Agreements with a new form of operating agreement. Sidhom alleges no facts plausibly suggesting that those attempts caused him to suffer any compensable injury. This allegation therefore fails to state a viable claim for breach of contract or breach of fiduciary duty. See, e.g., Bulwer, 473 Mass. at 690; Eisenstein, 444 Mass. at 267.
Fifth, Sidhom also cannot sue William Sr. and Kenney on the ground that they asked him (as well as all of the Individual Defendants) to personally guarantee repayment of a new loan to Ourly Grind LLC, without first telling Sidhom that Kenney was planning sell his ownership interests to the Daly Children.
As discussed above, absent an express contractual obligation to share certain information, the Individual Defendants cannot have violated the implied covenant by withholding that information. See generally A.L. Prime, 479 Mass. at 435; Boston Med. Ctr. Corp., 463 Mass. at 460. And Sidhom does not allege or claim that the Individual Defendants had any express contractual obligation to reveal Kenney’s plans to Sidhom.
Nor do the factual allegations in the complaint plausibly suggest that the Individual Defendants breached any fiduciary duty by not letting Sidhom know of Kenney’s plans before Sidhom signed the new loan guaranty. Sidhom alleges in ¶ 84 of his complaint that if he had known at the time that Kenney was planning to sell his ownership interests to the Daly Children, he would have used the request that he personally guaranty repayment of a new loan to Ourly Grind as leverage, and withheld his guaranty in an attempt to extort the Individual Defendants into letting him buy a share of Kenney’s ownership
 
                                                            -20-
 
interests. But Sidhom points to no case law suggesting that Sidhom’s wish that he could have used this information for extortionate purposes means that the Individual Defendants, acting in their capacities as Managers, had a fiduciary duty to share Kenney’s plans in advance with Sidhom.
6. Derivative Claims. For the sake of clarity, the Court will repeat in one place its rulings with respect to the various derivative claims that Sidhom asserts on behalf of the DKG Massachusetts LLCs (in count IX).
The request to dismiss the derivative claim that the Daly Children improperly increased their guaranteed payments without making a proportionate increase in Sidhom’s guaranteed payments is denied. As discussed in § 2.3 above, to the extent that Sidhom is seeking an alternative remedy requiring the Daly Children to repay part of their distributions, this is properly asserted as a derivative claim.
The request to dismiss the derivative claim regarding the extension of the Ourly Grind lease is also denied, for the reasons discussed in § 4, above.
The request to dismiss the Sidhom’s three other derivative claims is allowed.
o The derivative claim regarding negative account balances for the ownership interests that were transferred by William Sr. and Kenney fails for the reasons discussed in § 3.3 above.
o The derivative claim alleging that Sidhom was entitled to priority distributions until his Invested Capital was all returned fails for the reasons discussed in § 2.1 above.
o Finally, the derivative claim regarding the transfer of Kenney’s ownership interests fails for the reasons discussed in § 3.2.1 above.
7. Civil Conspiracy Claims. “Massachusetts law recognizes two distinct theories of liability under the umbrella term of ‘civil conspiracy’;” one is known as a “ ’concerted action’ conspiracy,” while the other is known as a “true conspiracy.” Greene v. Philip Morris USA Inc., 491 Mass. 866, 871 (2023) (citations omitted). Sidhom asserts claims against the Individual Defendants under both of these theories (in count X).
7.1. “Concerted Action” Claim. Paragraph 165 of the complaint lays out Sidhom’s claim under the “concerted action” theory of conspiracy, based on allegations that certain actions or conduct constituted a conspiracy to breach fiduciary duties.
 
                                                            -21-
 
To state a claim for civil conspiracy on a “concerted action” theory, a plaintiff must allege facts plausibly suggesting “an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement.” Bartle v. Berry, 80 Mass. App. Ct. 372, 383–384 (2011). In other words, this kind of conspiracy claim “is ‘akin to a theory of common law joint liability in tort.’ ” Greene v. Philip Morris USA Inc., 491 Mass. 866, 871 (2023), quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994).
The Court resolves each part of Sidhom’s “concerted action” conspiracy claim as follows.
First, the allegation that the Individual Defendants ignored Sidhom’s request for information about William Sr.’s and Kenney’s planned sales of their ownership interests does not support a conspiracy claim because Sidhom has not alleged facts plausibly suggesting that this conduct constituted a tort at common law.
Second, the allegation that the Individual Defendants failed to obtain Sidhom’s consent to the transfer of William Sr.’s and Kenney’s ownership interests fails to state a conspiracy claim both because it did not constitute a tort and because, under the MA-LLC Agreements, Sidhom’s consent was not required, as discussed above in § 3.1.1.
Third, the allegation that the Daly Children improperly increased their own guaranteed payments without granting Sidhom a proportionate increase in his guaranteed payments does state a viable conspiracy claim, as discussed in § 2.3 above.
Fourth, the assertion that the Individual Defendants improperly extended a property lease on behalf of Ourly Grind LLC may only be asserted as a derivative action; it therefore does not support a direct action by Sidhom for conspiracy, as discussed in § 4, above.
Fifth, the allegation that the Individual Defendants stopped providing Sidhom with general information about the business that they used to give to Sidhom does not state a viable conspiracy claim, because the facts alleged do not plausibly suggest that this constituted a breach of fiduciary duty.
Sixth, the allegation that the other Individual Defendants conspired with William Sr. “in strong-arming Sidhom to accept the terms of the Frequent Grind LLC operating agreement” fails to state a conspiracy claim both because that does not constitute a tort and because under Massachusetts law one may
 
                                                            -22-
 
not seek damages on a theory that one entered into a contract under duress, as discussed in § 5, above.
Seventh, the allegations about Kenney’s transfer of his ownership interests also fail to state a conspiracy claim.
The allegation that the Individual Defendants permitted this transfer “without proper authorization” fails to state a claim because Sidhom’s factual allegations establish that Kenney’s transfers received the only required approval, and also because the Individual Defendants’ conduct in approving Kenney’s transfers did not constitute a breach of fiduciary duty as a matter of law, as discussed in § 3.2.1 and § 3.2.3, above.
The further allegation that the Individual Defendants let Kenney transfer his ownership interests “without allowing Sidhom to participate” and purchase some of those interests does not state a conspiracy claim because the facts alleged do not plausibly suggest that the Individual Defendants had any fiduciary duty to let Sidhom buy some of Kenney’s ownership interests.
Finally, Sidhom’s allegation that the Individual Defendants did not require William Sr. and Kenney to restore the negative capital account balances associated with the ownership interests that they transferred to the Daly Children does not state a claim for the reasons discussed in § 3.3, above.
7.2. “True Conspiracy” Claim. Paragraph 166 of the complaint lays out the basis for Sidhom’s claim under the “true conspiracy” theory of civil conspiracy.
To state a “true conspiracy” claim, the IAFF must allege facts plausibly suggesting “that alleged conspirators agreed to accomplish an unlawful purpose or ‘a lawful purpose by unlawful means,’ … and then caused harm to the plaintiff via ‘some “peculiar power of coercion” ’ that they would not have had [if] they been acting independently.” Greene, 491 Mass. at 871 n.1, quoting Willett v. Herrick, 242 Mass. 471, 479–480 (1922), then quoting DesLauries v. Shea, 300 Mass. 30, 33 (1938); accord, e.g., Wodinsky v. Kettenbach, 86 Mass. App. Ct. 825, 837 (2015) (affirming jury verdict of liability under this theory).
If neither the purpose nor the means used is illegal, then an alleged combination cannot give rise to liability on a true conspiracy theory. See Neustadt v. Employers Liability Assur. Corp. Ltd., 303 Mass. 321, 325 (1939)
 
                                                            -23-
 
(affirming demurrers—what we would now call motions to dismiss[14]—and final decree dismissing action); DesLauries, 300 Mass. at 33–34 (affirming directed verdict for defendants); Robitaille v. Morse, 283 Mass. 27, 30–35 (1933) (affirming demurrers and ordering judgment for defendants).
The allegations that the Individual Defendants failed to disclose information to Sidhom, that they ignored Sidhom at certain meetings, and that they forced Sidhom to accept the Frequent Grind LLC operating agreement do not state a “true conspiracy” claim because these factual allegations do not plausibly suggest that the Individual Defendants did anything that was illegal or was aimed at achieving an illegal purpose.
The further allegation that the Individual Defendants extended the Ourly Grind lease without Sidhom’s consent, and did so even though the lease required payment of above-market rents, may only be asserted as a derivative action and therefore does not support a direct action by Sidhom for conspiracy, as discussed in § 4, above.
8. Declaratory Judgment Claims in Count XI. Given the Court’s determination that the facts alleged in the complaint do not plausibly suggest that Sidhom is entitled to declaratory relief in his favor with respect William Sr.’s and Kenney’s transfers of ownership interests, and with respect to the negative capital account balances associated with the transferred interests, the Court will also dismiss those parts of the claim for declaratory relief (in count XI). See Buffalo-Water 1, LLC v. Fidelity Real Estate Co., LLC, 481 Mass. 13, 18–22 (2018). This resolves the allegations in ¶¶ 169 to 174, and ¶¶ 180.a to 180.c, of the first amended complaint.
The rest of the declaratory judgment claim, concerning allegedly disproportionate increases in the Daly Children’s guaranteed payments and extension of the Ourly Grind lease, survive the motion to dismiss for the reasons discussed above. The Court will therefore not dismiss the declaratory
 
--------------------------------------------
 
[14] Before the Massachusetts Rules of Civil Procedure took effect on July 1, 1974, civil actions could be challenged through a “Demurrer.” The modern equivalent is the filing a motion to dismiss for failure to state a claim upon which relief can be granted, under Mass. R. Civ. P. 12(b)(6). Hub Theatres, Inc. v. Massachusetts Port Auth., 370 Mass. 153, 154 note a (1976); see also Curran v. Boston Police Patrolmen’s Ass’n, Inc., 4 Mass. App. Ct. 40, 40 (1976) (demurrer filed before July 1, 1974, was properly treated by Superior Court judge “as a motion to dismiss under Mass. R. Civ. P. 12(b)(6)”).
 
                                                            -24-
 
judgment claims set forth in paragraphs 175 to 180, and paragraphs 180.d to 180.e, of the complaint.
ORDER
The Individual Defendants’ motion to dismiss the claims against them in the first amended complaint is allowed in part as to:
o counts I, II, III, IV, V, VI, and VII of the first amended complaint;
o so much of count VIII that asserts claims for breach of contract against Elizabeth Brulport, William Daly Jr., and Thomas Daly (the “Daly Children”) (but not so much of this claim that is asserted against Daly/Kenney Group, LLC, which did not file a motion to dismiss);
o so much of count IX that asserts derivative claims concerning (a) an alleged failure to restore negative capital account balances associated with the ownership interest transferred by William Daly Sr. and Bernard Kenney to the Daly Children, (b) an alleged failure to make distributions to Nader Sidhom on a priority basis, or (c) the transfer of Kenney’s ownership interests and the failure to exercise the LLC’s rights of first refusal to acquire and liquidate those interests;
o so much of count X that asserts claims of civil conspiracy based on (a) alleged failure to provide certain information to Sidhom, (b) the transfer of William Sr.’s and Kenney’s ownership interest, (c) the extension of Ourly Grind LLC’s lease, (d) Sidhom’s acceptance of a new operating agreement for Frequent Grind LLC, (e) an alleged failure to restore negative capital account balances associated with the ownership interests transferred by William Sr. and Kenney; and
o so much of count XI that seeks a declaratory judgment as to the matters alleged in paragraphs 169 to 174, and 180.a to 180.c, of the first amended complaint.
This motion to dismiss is denied in part as to:
o so  much  of  count  IX  that  asserts  derivative  claims  concerning
(a) increasing  guaranteed   payments  for   the   Daly  Children,   or
(b) extending Ourly Grind’s lease;
 
                                                            -25-
 
o so much of count X that asserts claims of civil conspiracy based on the increased guaranteed payments for the Daly Children; and
o so much of count XI that seeks a declaratory judgment as to the increased guaranteed payments for the Daly Children or the extension of Ourly Grind’s lease, as alleged in paragraphs 175 to 178, 180.d, and 180.e of the first amended complaint.
This order is without prejudice to Sidhom seeking leave to further amend his complaint to assert a claim against William Jr. and Thomas for breaching their alleged oral promise to give Sidhom a pro rata share of any ownership interests transferred by William Sr. when he retired.